Russell Greer
689 Vine Street
Murray, UT 84107
801-616-1067
russmark@gmail.com
Pro Se Litigant

FILED
U.S. DISTRICT COURT

2016 OCT 18  P 12: 44

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

---

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH CENTRAL DIVISION

---

| | |
|---|---|
| **RUSSELL G. GREER** and **TRICIA CHRISTIE**,<br><br>    Plaintiffs<br><br>v.<br><br>**GARY R. HERBERT**, in his official capacity as Governor of the State of Utah; **SEAN D. REYES**, in his official capacity as Attorney General of the State of Utah; **SIM S. GILL**, in his official capacity as District Attorney of the City and County of Salt Lake; **JACKIE BISKUPSKI**, in her official capacity as Mayor of the City of Salt Lake; **BEN McADAMS**, in his official capacity as Mayor of the County of Salt Lake; **KATHY BERG**, in her official capacity as Director of the Division of Commerce; **JAMES ALLRED**, in his official capacity as Business Licensing Manager for the City of Salt Lake; **ROLEN YOSHINAGA**, in his official capacity as Director of Planning and Development for the County of Salt Lake,<br><br>    Defendants | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br><br>`Case: 2:16cv01067`<br>`Assigned To : Pead, Dustin B.`<br>`Assign. Date : 10/18/2016`<br>`Description: Greer et al v. Herbert et al` |

1

The Plaintiffs, Russell Godfrey Greer and Tricia Christie, complain of Defendants and allege:

## INTRODUCTION

1.     American courts continue to recognize that private sexual activity is a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution.  Yet, when the private, consensual sexual activity occurs as part of a voluntary commercial exchange between adults, the State prohibits the activity and deprives those adults of their constitutional rights.

2.     To allow certain forms of Sexually Oriented Businesses, but to ban others creates not only a hypocritical moral law – but also a dangerous law where only certain due process and protection rights are granted to those who engage in conduct deemed permissible by the state while others are robbed of the same protections engaging in conduct that has been proven to be a "secondary effect" from the protected Sexually Oriented Businesses. To ensure that all people are protected, we must regulate all Sexually Oriented Businesses – including prostitution – or we must abolish it all.

3.     There are those who are unable to find partners their entire lives due to things beyond their control and therefore live in loneliness and never experience intimacy. Outlawing prostitution is implicit discrimination against the disabled and other lonely people, and is controlling their destinies and the self-determination of those who want to work in it and controlling of how they choose to use their bodies. They are not afforded the same protections as

those who engage in "hookups" or whom give their partners gifts with the expectation of receiving sexual favors of which is defined in state law as prostitution.

4.       Nevada is the only state in the nation to allow legalized prostitution. To travel there is an undue burden for those who are afraid of flying in airplanes or who cannot afford to travel there; for those who do not have cars; and for those who get sick during long periods of travel. The brothels are also too expensive for the average blue collar worker, due to greed from owners and workers, which causes undue burdens. Also, the cigarette smoke that fills up the brothels, allowed by the *Nevada Clean Indoor Act*, is harmful to the health of the non-smoking customer and worker and creates an undue burden.

5.       By this complaint, Plaintiffs challenge the constitutionality of the statutes (on their face and as they may be applied to Plaintiffs) criminalizing the commercial exchange of consensual, adult sexual activity inside houses of prostitution.  Plaintiffs seek a declaration that the laws themselves are unconstitutional, as well as preliminary and permanent injunctive relief prohibiting their enforcement and the allowance of receiving a license to be recognized just like every other Sexually Oriented Business.

## JURISDICTION AND VENUE

6.       The case raises questions under the Constitution of the United States and *42 U.S.C. § 1983* and this Court therefore has jurisdiction under *28 U.S.C. §§ 1331, 1343, 2201,* and *2202*.  This Court has supplemental jurisdiction over the Plaintiffs' state law claims under *28 U.S.C. § 1367*.

7.       Venue in this Court is proper pursuant to *28 U.S.C. § 1391(b)* because all Plaintiffs and Defendants either reside in or do business within this judicial district.  In addition,

venue is proper in this Court because a substantial part of the events giving rise to the claim occurred in this judicial district.

## THE PARTIES

8.      Plaintiff Russell Godfrey Greer ("Greer") resides in the City of Murray and the County of Salt Lake in the District of Utah. He is 25 years old and has his paralegal degree. Greer was born with a facial paralysis medically termed *Mobius Syndrome* which means he can't close his lips or move his eyes sideways. His disability has made his life difficult physically, socially, and also with finding a job in his field. He solicits escorts and sex workers in Nevada's legal brothels and in the City and County of Salt Lake as a means of coping with his disability and therefore faces a reasonable threat of prosecution for engaging in said conduct as he is in violation of *Utah Code 76-10-1302*. In his years of patronizing sex workers, he has seen that brothels work the best, in terms of safety for both parties, and so he tried to obtain a business license to open a brothel in Utah, which he would had then taken to the state legislature, county and city councils and had the laws surrounding brothels amended, but was denied by the Utah Department of Corporations and Commercial Code. He therefore seeks to have the laws surrounding brothels found unconstitutional and seeks that the law should be amended to only allow licensed brothels.

9.      Plaintiff Tricia Christie resides in the District of Utah and is currently a licensed sex worker in a Nevada legal brothel and also practices prostitution in the City and County of Salt Lake and therefore faces a reasonable threat of prosecution.

4

10.     Defendant Gary R. Herbert is the Governor of the State of Utah ("Herbert"). He is sued in his official capacity only. Herbert, an elected official, oversees that the laws are faithfully executed. *Utah Const. Art. 7, § 5(1)*.

11.     Defendant Sean D. Reyes is the Attorney General of the State of Utah ("Reyes"). He is sued in his official capacity only. Reyes, an elected official, has the duty of representing the State as prescribed and carrying out the laws. *Utah Const. Art 7, § 16*.

12.     Defendant Sim S. Gill is the District Attorney for the City and County of Salt Lake ("Gill"). He is sued in his official capacity only. Gill, an elected official, is the County of Salt Lake's public prosecutor and counsel in civil matters. *Utah Code 17-18a-202*.

13.     Defendant Jackie Biskupski is the Mayor for the City of Salt Lake ("Biskupski"). She is sued in her official capacity only. Biskupski, an elected official, exercises the executive and administrative powers of the municipality.  *Utah Code 10-3b-202(1)(b)*.

14.     Defendant Ben McAdams is the Mayor for the County of Salt Lake ("McAdams"). He is sued in his official capacity only. McAdams, an elected official, exercises the executive and administrative powers of the municipalities of the County. *Utah Code 10-3b-202(1)(b)*.

15.     Defendant Kathy Berg is the Director of the Division of Corporations and Commercial Code for the State of Utah ("Berg"). She is sued in her official capacity only. Berg is responsible for supervising corporation and commercial code filings in the State. *Utah Code 13-1a-2*.

16.     Defendant James Allred is the Business Licensing Manager for the City of Salt Lake ("Allred"). He is sued in his official capacity only. Allred is responsible for overseeing the

business licensing in Salt Lake City which includes Sexual Oriented Businesses (SOBs). *Salt Lake City Code 5.02.020; Utah Code 10-8-41.5.*

17.     Defendant Rolen Yoshinaga is the Director of Planning for the County of Salt Lake ("Yoshinaga"). He is sued in his official capacity only. Yoshinaga is responsible for overseeing the business licensing in Salt Lake County which includes Sexual Oriented Businesses (SOBs). *Salt Lake County Code 5.01.030; Utah Code 10-8-41.5.*

## STATEMENT OF THE FACTS

### THE HISTORY OF THE UNITED STATES' AND UTAH'S CRIMINALIZATION OF PROSTITUTION AND SOLICITATION

18.     Historically, there has been a lack of rigorous and systematic punishment of the commercial exchange of consensual, adult sexual activity within our nation.  For much of our nation's history, the commercial exchange of private sexual activity – at least where its solicitation and consummation was conducted discreetly and not on the public streets – was widely accepted, was not illegal, and was, in fact, integral to our development. It has existed ever since the country consisted of just 13 colonies, though, the demand for it was not high as the majority of the populace lived in rural areas. During the Revolutionary War, prostitutes would accompany the troops; lifting their morale. Prostitution became more accepted in the 1800s. See, e.g., Beverly Balos & Mary Louise Fellows, *A Matter of Prostitution:  Becoming Respectable, 74 N.Y.U. L. REV. 1220, 1283* (1999) (noting that in the nineteenth century, prostitution was "an essential component of industrialization"); *Prostitution and Sex Work, 14 GEO. J. GENDER &*

*L. 553, 554* (Tom DeFranco & Rebecca Stellato, eds., 2013) (describing how "[u]ntil the

nineteenth century, prostitution was generally legal in the United States and flourished in large

cities" until "groups concerned with social morality * * * crusaded against prostitution"); Gail

M. Deady, Note, *The Girl Next Door: A Comparative Approach to Prostitution Laws and Sex*

*Trafficking Victim Identification Within the Prostitution Industry*, 17 WASH. & LEE J. CIVIL

RTS. & SOC. JUST. 515 (2011).

  19. Even though all forms of prostitution flourished since the nation's conception

from the Colonial Era, brothels were seen as the safest way of regulating prostitution and as one

of the most lucrative ways as well. *A Renegade History of the United States.* Thaddeus Russell.

(2010). One of the most respected and successful brothels in the Industrial Age was the

Everleigh Club. The "club" was ran by two sisters, Ada and Minna Everleigh, in Chicago from

1900 to 1911. In stark contrast from other brothels at the time, the Everleigh Club was upscale

and catered to the finest gentlemen. The brothel was also different because it had set standards

that the workers had to live by or else they were terminated. *The Everleigh Club.* The Chicago

Tribune. Louise Kiernan. (2016) (http://www.chicagotribune.com/news/nationworld/politics/chi-

chicagodays-everleighclub-story-story.html). Though only a handful of states legalized brothels,

(Arkansas, Kentucky, Louisiana, New Mexico, and South Carolina), the rest of the country

prohibited them yet illegal brothels were tolerated because the brothels paid fees and bribes to

the police to stay in business. *The Lost Sisterhood: Prostitution in America: 1900-1918.* Ruth

Rosen. (1982).

  20. On July 5th, 1870, St. Louis, Missouri created the *Social Evil Ordinance* which

recognized brothels as a legitimate enterprise and required prostitutes and the brothels to register

with the police and to pay operating fees. *The Social Evil Ordinance.* (1982)

(http://www.americanheritage.com/content/social-evil-ordinance).   What started out as a good

plan to regulate prostitution soon became an overbroad mess: more brothels opened than could

be managed; the girls in the brothels soon began running their own businesses inside of the

brothels; the doctors (there was only six of them) were in charge of checking the girls for

diseases and collecting the fees from the girls and the brothels proved to be too much for the

doctors to juggle. The police also abused their power and began harassing the prostitutes. By

1874, the Ordinance was repealed and prostitution in all aspects was made illegal on a state level.

*Id.*

21.     In 1897, Alderman Sidney Story, a New Orleans City Councilman, saw how

prostitution was inevitable to happen so he created a red-light district to control all forms of vice.

Thus was the creation of Storyville: a 38 block "district" that was the home to brothels and all of

the "taboo" things to the "respectable" person. *"1903: Storyville, New Orleans' Red-Light

District"*. The Times-Picayune. (2016).  Storyville was ordered shutdown November 14th, 1917

after four U.S. Navy men were killed in separate weeks within the District (though they were

advised by their superiors to not solicit). Secretary of the Navy Josephus Daniels said that

Storyville was a "bad influence" to those who went there. Before closing it, New Orleans Mayor

Martin Berhman quipped, "You can make it illegal, but you can't make it unpopular." *"An Old

House in the Quarter: Vice in the Vieux Carré of the 1930s"* (1996).

22.     The only state that has legalized prostitution is Nevada. When Nevada became a

state, in 1864, its legislature allowed incorporated cities the right to regulate prostitution. *The

Mississippi of the West?,* 5 NEV. L.J. 57, 58 (2004). In 1881, the Nevada Legislature passed the

*Town Board Act* which allowed county commissioners the right to regulate prostitution in unincorporated areas. *Presentation by Nevada State Archivist of the History of Prostitution in Nevada (1999)(* http://www.nvbrothels.net/infoHistory.shtml). Such legislation left the legality of brothels in the hands of the counties and not part of the state's affairs therefore each county had different regulations for their brothels. There was a few state imposed laws that affected all of the counties that are still on the books today such as laws against pandering (*NRS 201.300-60*); prohibiting a person from living off the earnings of a prostitute (*NRS 201.320*) (law is hardly enforced); brothels cannot be within 400 yards of a school or a church (*NRS 201.380, 201.390*). In 1937, Nevada's State Board of Health mandated weekly checks for gonorrhea and monthly blood tests for syphilis *(Nevada Admin. Code chp. 441A, 800)*. When the AIDS epidemic hit America, the Board of Health added codes to check for HIV/AIDS *(NAC 441A010-A325; NAC 441A775-A815)*.

23.     Clark and Washoe Counties (Las Vegas; Reno) used to have brothels – in the early 1900s, but the County Commissioners voted to shut down the red-light districts in those cities citing them as nuisances. *The Best Little Whorehouse…* Snadowsky (2005). Two cases followed, seven years apart, *Kelley v. Clark County* (Nev. 1942) and *Cunningham v. Washoe County* (Nev. 1949), in which the Nevada Supreme Court ruled in favor of Clark County citing county supremacy. *Kelley v. Clark County* (Nev. 1942). To avoid further cases of being shut down for being a nuisance, brothel owner Joe Conforte successfully petitioned for a brothel to be licensed to avoid being a public nuisance in which the legislature made a brothel legal in a county that had less than 200,000 residents (the number has since been risen to 400,000) (*NRS 244.345*). Soon after, almost every county in Nevada voted to allow legalized brothels.

24.     Nevada has repeatedly refused to make brothels a state issue or issue a state

official ruling and thus leaving it to the counties and cities to decide therefore running the risk of

being voted to be closed down by city councils or the voters. (The mayor of Ely vetoed the city

council in Ely, Nevada to shutdown brothels in that county in 1999 saying that they had the

moral "responsibility" to keep brothels legal to fight the AIDS epidemic; Churchill County voted

in 2004 to keep brothels legal; Nye County voted the same in 2004). *Brothels in Nye County to*

*Stay Legal.* Las Vegas Sun. (2004).

25.     While prostitution has always occurred in Utah since Brigham Young settled

Deseret, it reached its peak of "ill fame" in the late 1800s when a prominent brothel was

established on the West Side of Salt Lake City located on 1st South and 500 West. *Living*

*History: Utah Had Its Own Share of Ladies of the Night.* The Salt Lake Tribune. (2012). The

brothel was known as "The Stockade". It was considered a nuisance and the brothel was

frequently raided by police. Belle London, whose real name was Dora Topham, was the Madam

who ran the brothel. It achieved all kinds of notoriety that followed the Mormon missionaries in

Europe which many Europeans thought the missionaries were trying to take their daughters to

"The Stockade". *The Oldest Profession's Sordid Past in Utah.* The Salt Lake Tribune. (2016).

(http://historytogo.utah.gov/salt_lake_tribune/in_another_time/theoldestprofessionssordidpastinu

tah.html).

## THE CURRENT LAW OF THE STATE OF UTAH

26.     As it stands now, Chapter 10, Part 13, sections 1301-1308 in Title 76 of the

Criminal Code of Utah, criminalizes all acts of prostitution, defined as any person who "engages

in any sexual activity with another individual for a fee, or the functional equivalent of a fee", as

Class B Misdemeanors. *Utah Code 76-10-1302(1)(a)*. It also pertains to those who are "inmates" in a house of prostitution and those who own, lease, enter, solicit, patronize or remain in a house of prostitution. *Utah Code 76-10-1303(1)(b)*.

27.     "Sexual activity", as defined by the Utah Code, means acts of masturbation, sexual intercourse, or any sexual act involving the genitals of one person and the mouth or anus of another person, regardless of the sex of either participant. *Utah Code 76-10-1301(5)*.

28.     Title 47, Chapter 1, Section 1, of the Utah Code declares that whomever seeks to "erect, establish, maintain, use, own or lease any building, structure or place, for the purpose of lewdness, assignation or prostitution is guilty of nuisance, and such building, structure or place, and the ground itself, in or upon which such lewdness, assignation or prostitution is conducted, permitted or carried on, and the furniture, fixtures and musical instruments therein and the contents thereof are declared a nuisance, and shall be enjoined and abated as hereinafter provided." *Utah Code 47-1-1; Utah Code 78B-6-1101(2)(g)*. A nuisance is a Class B Misdemeanor. *Utah Code 76-10-801*.

29.     Furthermore, the Utah Code allows for the municipalities and the counties of the State to enact laws to suppress and prohibit prostitution and brothels. *Utah Code 10-8-41(1)*.

30.     Plaintiffs, having experience soliciting and working in brothels, seek to have a brothel erected in the District of Utah where not just prostitution occurs, but other adult activity that includes escorting, nude dancing, and other activities which are sexual and non-sexual and are currently regulated by the State. They seek to have the brothel licensed like other Sexually Oriented Businesses in the State. *Utah Code 10-8-41.5(3)*.  Having a licensed brothel in Utah would protect them from prosecution; give them equal protection and due process under the law;

11

and not create an undue burden by having to travel to a different state where it's legal. They seek to have unlicensed brothels be a crime. Additionally, they seek to have all other statutes criminalizing prostitution, not occurring inside brothels, remain enforced and intact. If brothels become legalized, they would seek to have all other forms of prostitution be a felony and a sex offense and the offenders be registered as sex offenders in order to deter it and keep it regulated.

31.     Because Utah's statutes make it a misdemeanor for a house of prostitution to be erected, leased, or controlled; for one to enter or remain in a house of prostitution, and for one to engage in sexual activity in a house of prostitution (*Utah Code 76-10-1302(2)(b); 76-10-1303(1)(b); 76-10-1304(1)(a)(iii); 76-10-1305(1)(a)(e))*, the District Attorney, the Attorney General, and their respective offices are charged with the duty of enforcing the statutes in the County and State.  Compelled by this duty, the District Attorney and the Attorney General are presently enforcing this state law in contravention of Plaintiffs' constitutional rights.

32.     Governor Gary Herbert, as executive leader of the State, oversees all legislation and therefore is acting in color of authority by ensuring that these laws stay intact and hinders Plaintiffs' constitutional rights.

33.     Berg, Allred, and Yoshinaga are compelled to not issue business licenses for those businesses deemed "illegal" and therefore hinders Plaintiffs' attempts from obtaining a license to try to amend State, County, and City laws surrounding houses of prostitution.

## THE EFFECT OF UTAH'S LAWS ON PLAINTIFFS

34.     Due to Plaintiff Greer's disability, he has struggled to find a partner despite having a college education; having served an LDS mission; being an Eagle Scout; having worked

at various businesses and firms located in downtown Salt Lake and being friendly and sociable; maintaining a good appearance and being physically fit; and trying all forms of dating: online dating, in-person dating, mutual friend set ups, church social events, etc. The current materialistic world has made dating difficult for Greer.

35.     Greer first decided to solicit prostitutes after a failed suicide attempt in January 2013 after being disowned by his birth family and his twin sister. He felt that paying for intimacy would help him feel loved and help him cope with his disability and his depression after counseling and medicine proved to not be effective.

36.     Because prostitution is illegal in Utah, Plaintiff Greer has had to travel long distances to where it's legal. The closest legal brothel to Salt Lake City is located in Elko, Nevada which is four hours away. Greer does not own a car so he has had to take an Amtrak to a legal brothel eight hours away near Reno, Nevada as the Amtrak goes to and leaves Elko at unreasonable hours of the early morning.

37.     Greer's first encounter with a prostitute was at Dennis Hof's Love Ranch North brothel near Reno, Nevada in April 2013. Greer saved for months on end to afford the encounter as he had heard that it wasn't cheap. After eight hours on a train, he met Jade, a licensed sex worker. The moment with Jade was magical. He never felt so alive before. For the first time in his life, he felt accepted by a woman. He felt cared about. And even though it was paid for, it was something – because something means everything when you have nothing.

38.     Greer has treated the working girls as if they were his girlfriends: dressed in suits to look nice for them; gave them flowers; bought them dinner; engaged in polite, clean conversations with them.

13

39.     Greer has continued to make continuous travel to Reno for the past three years and has spent $14,000.00 at the brothels in total. It has meant so much to him, and being with caring, affectionate women has boosted his self-esteem and confidence.

40.     The travel, though, has been laborious, as Greer spends 16 hours roundtrip on a train and is only in the brothel for up to two hours which departs and arrives in Salt Lake City at very late hours. To make matters worse, the brothels, though ventilated with air vents, are filled with smoke and the smoke chokes Greer, as he is a non-smoker, and smells up his clothes. In addition, the prices of the brothels are too expensive for a recent college graduate like Greer.

41.     These undue burdens have forced Greer to engage in prostitution with prostitutes in Salt Lake City illegally, as they are cheaper and don't smell of smoke. He has engaged in oral and vaginal sex with several local prostitutes.

42.     Engaging with prostitutes in Salt Lake City has not only put Greer under threat of prosecution, but has put him at a threat of catching a venereal disease as the girls have no way of being verified if they are free of a sexually transmitted disease. Greer has also been defrauded by several local escorts who have posted fake pictures to lure Greer in and upon meeting, he is then held under duress to give them the money. Others have been the same girl as advertised, but they do not provide the services they promise.

43.     Several local prostitutes have told Greer that local men have robbed, raped, and beaten them and they have been too afraid to go to the authorities in fear of prosecution.

44.     After a licensed sex worker at the Bunny Ranch brothel, near Reno, Nevada, stole $4,000.00 from Greer through fraudulent inducement and he had a falling out with the owner, in late 2014, Greer decided he had had enough of going to the Nevada brothels.

14

45.     Greer went to an Elko brothel and the feel was just not the same as the Reno brothels: no connection or anything intimate.

46.     Greer continued to solicit escorts and prostitutes in Salt Lake City for sexual, but mostly non-sexual services while going to college and doing an internship at the Attorney General's Office in the Litigation Division.

47.     *Obergefell v. Hodges* was decided in the Summer of 2015 and after studying it for a college research legal paper on whether polygamy could be legalized, the words of the ruling inspired Greer and he felt it applied to him and prostitution.

48.     Greer graduated from the LDS Business College in the Summer of 2015 and was hired on with his first firm, an intellectual property law firm, two months later.

49.     A month later, at the end of November 2015, Greer was brought into the firm manager's office and was laid off after the manager said that there had been rumors about Greer and that they were "extremely disturbing". Greer felt these rumors had to do with his experiences with prostitutes as his college had had similar rumors about him encountering prostitutes.

50.     Seeing that his interest in prostitution had caused him financial harm, Greer decided that he was going to apply the wording of *Obergefell* and make prostitution legal so that everybody could have access to intimacy. Greer was tired of doing things illegally and really had no brothel to go to since his falling out with Dennis Hof.

51.     Towards the end of December 2015, Greer filled out the business licensing paperwork on Utah.gov to try gaining a brothel license – the same way one obtains a Sexual Oriented Business License. Once obtained, Greer would go to the state legislature and try to amend the laws. Greer even obtained an IRS EIN for his proposed business.

52.     Greer named his proposed brothel, "The Mile High Neon" which is a take on "the mile-high club" and the Greek word for brothel, "porneon".

53.     Greer believes that he is of the moral character to run a safe, legal brothel. He is an Eagle Scout for the Boy Scouts of America; he served an LDS Mission; has paralegal training to ensure that the brothel would follow regulations and has a business plan to "expedite" the prostitution process by empowering the sex workers and to protect adults.

54.     Greer submitted his paperwork online and it was approved on December 29, 2015. The State gave him numbers for his business registration and the appropriate documents to file at the Salt Lake City and County Building.

55.     Greer received a notice from Berg, on January 14, 2016, that his registration had been cancelled "effective immediately" because it had been for "an illegal business purpose" thus resulting in harm to Greer. Greer decided to sue the state and gave notice to the Attorney General through electronic mail in accordance to *Federal Rules of Civil Procedure 5.1.*

56.     Greer, being low on cash and not being able to secure a grant to put down on an attorney retainer fee, decided on April 12, 2016, to represent himself Pro Se, as he felt he could do just as good a job in arguing and presenting the case.

57.     Greer met Plaintiff Tricia Christie, sometime in 2016, at her apartment in downtown Salt Lake City near the Gateway Mall and they engaged in sexual intercourse in exchange for $500.00 thus committing the act of prostitution as defined by *Utah Code 76-10-1302.*

58.     Plaintiff Tricia Christie has been an escort and a prostitute for several years and has worked in California, Chicago, several legal brothels in Nevada, and in Utah. She also travels abroad as an escort and engages in sexual intercourse with foreign men.

59.     Christie enjoys her work and likes making people happy and the income that it provides and is why she does it. She spends nearly a thousand dollars on beauty products and gym memberships every few months to stay fit and attractive.

60.     Christie is not being forced to engage in sexual activity. She engages in it freely. Besides engaging in prostitution, Christie also works as an adult film star and a model and finds clients in all industries *which proves that the sex industry is all connected and is thus hypocritical and dangerous to allow one form of business be legal, but other forms be illegal.* Christie hopes one day to afford to buy a house.

61.     Plaintiffs both fear that they may be prosecuted by the District Attorney and the Attorney General under Utah's prostitution laws if they do engage in sexual activity for hire, particularly in light of their participation in this lawsuit.

62.     This is difficult for both Christie and Greer who have both solicited and engaged in prostitution in Nevada brothels and were not subject to prosecution. They both see hardships by soliciting and working in the Nevada brothels: owner greed, strict working hours, expensive prices, second-hand smoke filled rooms. They both affirm that if there were a legal brothel in Salt Lake City and County, they would follow the law and solicit and work in such a brothel, but there is not.

63.     Plaintiffs' fears of arrest and prosecution, if they choose to continue in prostitution, are reasonable and grounded in actual enforcement activities throughout the State of

Utah.  Without the legalization of a brothel, the laws threaten to impact the sexual privacy rights of Plaintiffs and countless others who desire to sell or purchase sexual services.

64.     Additionally, the criminalization of brothels under *Utah Code 76-10-1302* harms Plaintiffs because criminalization serves to discourage safe sex practices whereas legalization and regulation would mandate condom use as seen with Nevada.  For example, when prosecuting cases under the Utah Code, the Defendants can use the fact of condom possession as evidence of prostitution-related offenses.  By doing so, the Defendants discourage condom use and thwart safe sex practices.  See generally SEX WORKERS AT RISK:  CONDOMS AS EVIDENCE OF PROSTITUTION IN FOUR US CITIES (HUMAN RIGHTS WATCH 2012). Nevada laws and regulation mandate that condoms be worn in every sexual act.

65.     Plaintiff Greer has laid out the business plan for the Mile High Neon which would balance state interest in protecting the morals of the State, County, and City; control the spread of sexual disease; and would protect those who wish to engage in prostitution or other sexually oriented business activities.

## THE BUSINESS PLAN OF THE MILE HIGH NEON BROTHEL
## THE DESIGN AND LAYOUT

66.     To avoid public nuisance laws, plaintiff seeks to build his brothel in a rural part of Salt Lake City and County so that the location is away from the general public and is not near any freeways or highways (*Restatement[Second] of Torts 821B [1]; take into consideration: NRS [Nevada Revised Statutes] 201:380,201:390).* Plaintiff also seeks to legally have transportation that takes patrons to the brothel just like the Bunny Ranch brothel in Nevada does.

67.     The design of the Mile High Neon will resemble a Greek temple hence the last word of the brothel name.

68.     The building will be gated and will consist of elegant walls meant to keep trespassers out. The front of the building is held up by Greek columns. A little past the columns is a large wooden door that resembles the front door to a luxury mansion. A door man will stand at the door and will not only greet, but will also act as a bouncer.

69.     Inside, will be a pristine, marble floor, and chandeliers that hang from the ceiling. Music plays, creating a lively atmosphere. In the center of the room is a fountain with water that runs soothingly. Couches for guests and the workers to sit on will be located in a corner. Hanging on the walls near the couches are TVs that play the news and other channels for guests to enjoy.

70.     A non-alcoholic bar will serve beverages to customers and visitors.

71.     A business directory will be located at the front of the brothel which will feature a touch screen where clients can click on the girls they want and call them to meet them which is no different from how other businesses let their clients meet their professionals. This will differ greatly from the Nevada brothel system where the girls are summoned to the door by the sound of a buzzer and are forced to line at attention for customers that walk in. Many, including columnist Bob Herbert, have criticized this form of system as being degrading. *Politics and Misogyny*. (http://www.nytimes.com/2008/01/15/opinion/15herbert.html?_r=2). Plaintiff Greer disagrees with this system.

72.     A cash office will be located in the brothel to conduct the transactions.

73.    Past the cash office is a hallway that has all of the different rooms of the working girls. Each room has a window and a king sized bed. There is also a shower and a bathroom in the room. On the wall is a TV hooked up with Dish Network. Next to the bed is the panic alarm and a speaker for the office to communicate with the girl. There will be about ten rooms.

74.    In a different hallway, that is adjacent to the hallway that has the girls' rooms, is a hallway that has two suites meant for bi-sexual or gay male sex workers who service LGBT clients.

75.    In the middle of the hallway would be an exercise room. Next to it, would be a Jacuzzi room.

76.    Once the patron pays the negotiated amount of time with the sex worker, the cashier sets a timer of the amount paid for.

77.    There will also be a kitchen in the Neon to allow the workers to cook their own meals.

## POLICY/PROCEDURES OF THE MILE HIGH NEON

78.    The policy and the procedure of the Mile High Neon will follow similar policies and laws of the Nevada brothels. Greer, though, proposes additional innovative policies that correct the flaws of the Nevada brothels.

79.    The girls will be inspected weekly for STDs and tested biweekly for HIV (*NAC chap. 441A010-A325; 441A775-A815; NRS 201.356-58*). Once a week, a doctor will come and teach the girls on how to check for STDs and about safe sex practices. Condoms are mandatory. Contracts will be written to make sure the girls agree to these terms. Any breach of the contracts will lead to fines and/or termination of the girls.

80.     Unlike the brothels in Nevada, the Mile High Neon will be smoke free and will prohibit smoking. If working girls are smokers, they will be given the opportunity of being given resources to overcome the addiction. If not, they will not be allowed to smoke on the premises.

81.     The Mile High Neon will not serve alcoholic beverages -- given the current state of rules with Sexually Oriented Businesses and drinking, and observing from Nevada brothels how drunk men and naked girls do not create a safe environment. Greer also doesn't want to be held liable for drunk driving aka *dram shop laws.*

82.     The workers will be able to apply online. While not procuring, the brothel will sort its applicants for the classiest and most beautiful people that have extraordinary personalities and who are not judgmental. The brothel also wants to choose workers who have life goals ahead of them and -- realizing this is a lucrative job -- help them achieve their goals. Plaintiff wants the workers employed for a maximum of two years and each year he wants to see how they are coming about reaching their goals. For instance, if a worker needs money for college, she would be encouraged to set a goal of $50,000.00 for tuition and expenses (that would be an example). Since the workers would be independent contractors, they would be responsible for how often they worked and how fast they reached their goal in a two-year period. Once they reached their goal, the brothel would encourage the workers to go after their dreams thus "expediting" the prostitution process. He would put them in touch with talent agents to work non-sexual jobs.  He feels this will resonate well with the public as it shows he values women and isn't an "evil person" as often associated with prostitution.

83.     For the workers who apply, but don't meet the criteria of a sex worker, whether they be too old, not attractive, they have STDs, etc, the brothel would refer them to talent

agencies as many people want in prostitution for the money. Referring people to talent agencies and getting them in good jobs would stop the "circulation" of the adult entertainment industry: going from brothel to strip club to porn star. This is backed up by the City of South Salt Lake's findings that strip clubs have secondary effects. *An Ordinance Of The City Of South Salt Lake City Council Amending Chapter 5.56 Of The South Salt Lake City Municipal Code, Concerning Licensing Requirements And Regulations For Sexually Oriented Businesses.* (2012.09.21_South_Salt_Lake_SOB-Ord-final-mr.pdf). It's a giant connected ring of entertainment that women can be stuck in for years. While Greer isn't against adult entertainment, he believes that women can be so much more than cover girls and hookers and he doesn't think criminalization is the answer. Greer believes that encouragement and regulation is the answer.

84.     For the girls that are contracted as independent workers, they would be given trainings on self-defense; checking for STDs; understanding the disabled; how to politely turn down a customer; how to balance a budget; how to be empowered.

85.     The girls will be licensed through the sheriff's office in order to make sure they are of legal age and are not criminals. The sheriff's office will conduct an STD test on them when they are first hired.

86.     The brothel will also pay state taxes and make charitable donations to the communities that surround it.

87.     The Mile High Neon will implement the regulatory system established in the Nevada brothels and will aim to be a safe place for consenting adults. Barbara G. Brents & Kathryn Hausbeck, *State-Sanctioned Sex: Negotiating Formal and Informal Regulatory*

22

*Practices in Nevada Brothels* (2001). The brothel will promote the Public Health, Safety, Welfare and Morals of Utah by allowing an alternative to arrest and encourage those in it to reach whatever financial goal they have and then help them adjust out of it to a better life to avoid physical and emotional "Russian roulette". Jeffrey R. Holland, *Personal Purity* (1998) https://www.lds.org/general-conference/1998/10/personal-purity?lang=eng).

88.     The most important thing is that Greer does not seek to own or run the brothel. If the laws were found to be unconstitutional and the legislature created laws to allow it, Greer would give the business license to an educated, classy, beautiful woman in her mid thirties to forties who has higher education and experience in business; somebody who could align with the policies of Greer's proposed brothel and help women in them. Greer's role would be that of a legal assistant to ensure all regulations were followed and to follow up on any complaints.

89.     With all of the policies, procedures, and history of the plaintiffs' backgrounds explained, the enforcement of Utah's brothel laws violates the First Amendment rights of Plaintiffs and others similarly situated by making pure speech a criminal activity and by defining a crime based solely on the speaker's message and the content of his or her speech.

90.     It also violates the Fourteenth Amendment rights of Plaintiffs.


**CLAIMS FOR RELIEF**
**CLAIM ONE:**
**Section 1983 Claim for Violation of Fourteenth Amendment**
**Substantive Due Process Right to Sexual Privacy**


91.     Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

92.     As Applied sections of Title 76, Chapter 10, Sections 1302-1308, concerning

houses of prostitution (*Utah Code 76-10-1302(2)(b); 76-10-1303(1)(b); 76-10-1304(1)(a)(iii);*

*76-10-1305(1)(a)(e)))*,, and As Applied sections of Title 47, Chapter 1, concerning brothels

being nuisances, violate the right to substantive due process as guaranteed by the Fourteenth

Amendment to the United States Constitution in that the As Applied sections of the statutes, as

would be applied to Plaintiffs, impinges upon the fundamental liberty interests in one's own

private sexual conduct recognized by various courts throughout the United States. *See Lawrence*

*v. Texas*, 539 U.S. 558 (2003); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008);

*Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014) (Berzon, J., concurring) ("More recently, *Lawrence*

clarified that licit, consensual sexual behavior is no longer confined to marriage, but is protected

when it occurs, in private, between two consenting adults...")

93.     The rights of adults to engage in consensual, private sexual activity (even for

compensation) is a right with no rational basis in being kept banned -- if not a fundamental

liberty interest. That right is one that is, objectively speaking, deeply rooted in this nation's

history and tradition and one that is implicit in the concept of ordered liberty. *Seegmiller v.*

*Laverkin City,* 528 F.3d 762, 769 (10th Cir. 2008) (See also: *Washington v. Glucksberg,* 521

U.S. 702, 719 (1997) which laid out the criteria for evaluating a claim for a fundamental right by

looking at historical value of declared right and whether that right fits under a pre-existing right).

*Seegmiller* established that for guiding rational basis review, *Lawrence v. Texas* was to be

followed. There seems to be conflicting conclusions as to whether sexual privacy is a

fundamental right (as determined with *Obergefell v. Hodges*) or if it's evaluated for rational basis

review as found in *Lawrence.*  But like with *Roe v. Wade*, though, the right to privacy can be

24

balanced to meet both state interests and individuals' liberties. *Roe* paves the way for the legalization of prostitution, as abortion clinics are like brothels in many instances as they protect the worker and the client. *Roe* establishes the right to commercial privacy and that right should be extended to brothels. That is why brothels are important so that they can balance both state interests and personal rights. The 9th Circuit in *Coyote Publishing*, when evaluating the constitutionality of prohibiting legal brothels from advertising in Nevada counties in which prostitution is banned, called the Nevada brothel system "unique" and that it is able to balance state interest with personal freedom. *Coyote Publishing Inc. v. Miller* (9th Cir. 2010). Nevada has proven that this can be done. Therefore, any regulation regarding the commercial exchange of private sexual activity is subject to strict scrutiny. But if a fundamental liberty right cannot be declared, there is no rational basis to banning brothels.

94.     While there is a legitimate governmental interest in controlling prostitution and keeping the face of most of the criminal statutes on the books such as prostitution occurring in an open, public area, there is no compelling reason to not allow licensed, regulated brothels to function. Unlicensed brothels would still remain illegal so the house of prostitution sections would remain on the books. The wording, though, is hoped to be changed to reflect this challenge to allow licensed brothels. The government actually has an interest in regulating prostitution and controlling its activity to take part in one place for a number of reasons: (1) to protect its citizens from scams that pose on adult websites offering services, but turn out to be fraudulent which are often seen on the escort section of *BackPage*; (2) protecting its citizens from sexual diseases; (3) and to protect its citizens from human trafficking. All three of these are goals of the State of Utah. *Priorities, Attorney General of Utah* (Priorities listed on AG's website

include "protecting citizens from violent crime....and consumers from fraud").

(http://attorneygeneral.utah.gov/priorities). (See also: *Our Mission, Utah Department of Health,*

which lists a mission statement of preventing illness amongst other ailments. The site also has

charts and data reports on sexually transmitted disease rates with focuses on *Chlamydia*

*trachomatis* and *gonorrhea*, the two most communicable STDs in Utah. Data charts show that

both diseases had a 48% growth rate in Utah from 2004-2014.)

(http://ibis.health.utah.gov/phom/UDOH.html).

95.     Any concerns of establishing a brothel for fear of disease is misguided as the

state already has an STD problem. If anything, brothels would help control diseases through

mandatory safe sex as observed in many studies of Nevada brothels. Barbara G. Brents &

Kathryn Hausbeck, *Violence and Legalized Brothel Prostitution In Nevada: Examining Safety,*

*Risk, and Prostitution Policy,* University of Las Vegas (2005). In 2012, it was found that the

Nevada brothels were more safe than the California porn industry. Ken Miller, *Study Says*

*Nevada Brothel Workers Have A Lower STD Rate Than LA County Porn Actors.* Las Vegas

Weekly. (2012). A regulated brothel can solve and prevent all of the problems listed in point 94.

Several local government officials even agree that a brothel could do this if established in Salt

Lake County. Stephen Dark, *Only the Lonely,* Salt Lake City Weekly (2016)

(http://www.cityweekly.net/utah/ohhoney/Content?oid=3168969&storyPage=4).

96.     Furthermore, the fact that the governing majority in a state has traditionally

viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting

its practice. *See, e.g., Baskin v. Bogan*, 766 F.3d 648, 669-70 (7th Cir. 2014) (Posner, J.) (citing

*Loving v. Virginia*, 388 U.S. 1 (1967); *Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012); and

*Lawrence v. Texas*, 539 U.S. 558 (2003)).

97.     Utah's prohibition against the commercial exchange of private sexual activity in

brothels is not narrowly tailored, nor is it the least restrictive means for advancing whatever

governmental interest that the Defendants may claim the law advances.

98.     By prohibiting licensed brothels, the As Applied statutes precludes many

individuals, including both those who want to sell their sexual services and those who want to

buy them, from deciding how to conduct their private lives in matters pertaining to sex. This law

also significantly hinders, if not deprives, many individuals from their ability and right to engage

in sexual intimacy.

99.     Insofar as they are enforcing Utah's brothel laws, the Governor, District Attorney,

members of local and state commerce, and the Attorney General, acting under color of state law,

are depriving and will continue to deprive Plaintiffs of rights secured by the Fourteenth

Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

100.     Plaintiffs are therefore entitled to a declaration of unconstitutionality and

injunctive relief prohibiting the enforcement of As Applied sections of Title 76, Chapter 10,

Sections 1302-1308 and As Applied sections of Title 47, Chapter 1.


### CLAIM TWO:
### Section 1983 Claim for Violation of Fourteenth Amendment
### Equal Protection Rights

#### A.  Denial of Equal Protection of the Same End Goal of Intimacy


101.     Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully

set forth herein.

102.     To reiterate, Plaintiff Greer has a physical disability termed "Mobius Syndrome". A disability is defined by the ADA as an impairment – physical or mental – that impedes one or more of life's daily activities. *What Is the Definition of a Disability Under the ADA?* (https://adata.org/faq/what-definition-disability-under-ada). His disability has hindered his dating life in all aspects and he has not been able to meet a non-commercial partner due to it even when he has given his all and pursued all kinds of women online and in-person. While realizing that he is perfectly free to approach anybody and ask them out, that is not what Greer is arguing for. He wants to have the same end result of dating as non-disabled people freely get i.e. kissing and other intimacy which includes sex. He feels that not being able to pay a woman in Salt Lake denies him of his equal protection rights as found in the 14th amendment. There are escort companies in Salt Lake that are licensed, but they upsell their customers and usually do not offer much more than a strip tease.

103.     The guarantees of the 14th amendment apply to all citizens of the United States with equal opportunity of pertaining available rights. They are personal rights. *Shelley v. Kraemer* (1948). In her concurring opinion, Justice O'Connor determined that the State of Texas could not "control" the destinies of homosexuals from engaging in sexual privacy rights. *Lawrence v. Texas* (2003). People with disabilities, such as Greer, face the same problem of having their destinies being controlled by the State of Utah. The plight of people with disabilities to live their lives freely has been an ongoing struggle due to discrimination. The discrimination was particularly brought to light with the case of *Buck v. Bell* (1927) when Justice Holmes said that forced sterilizations of people with disabilities was constitutional because "three generations

of imbeciles are enough". It wasn't even until the late 90s that federal law was signed to protect people with disabilities.

104.     Though the law may apply to all persons who engage in prostitution in a house of prostitution in Utah regardless of difference in class, it is actually implicit discrimination against disabled people. The law has a disparate impact on disabled people or those who are in other circumstances because they comprise a higher percentage of patrons who pay for those kinds of services. *Texas Department of Housing v. Inclusive Communities Project* (2015) (Disparate impact litigants could cite statistical data to show discrimination, though, their claims would fail if they could not show how the policies are discriminative).

105.     The As Applied sections of Utah's brothel laws are discriminative because they are controlling of how one decides how to conduct their private lives. They force plaintiff and others similarly situated to plaintiff to travel long distances to Nevada, basically being forced to flee their homes to engage in legal conduct in another State, risking the perils that long distance travel brings. But for those who cannot afford to travel or are afraid to travel or who have no car or get sick travelling long distances, the law forces them to remain "unintimate" or to go into criminal activity. There is no alternative for these people if they desire to have sex, but are unable to get it because of the materialistic world and the judgement of people. It invades their personal liberty choices. *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 847 (1992). It is also an undue burden to plaintiff. It places a hardship on him due to the cost of the brothels and the travel. *Id.* The brothels also allow smoking and the smoking is hazardous to Greer's health as he is a non-smoker. When he usually returns from his trips, his suits reek of cigarette smoke. Being forced to engage in a brothel where smoking is allowed in the open, places terrible

29

burdens on Greer and is a contributing factor as to why he has solicited in Salt Lake because he wishes to not be around that atmosphere. *Id.*

106.    With hook up apps and dating apps available for download, consensual sex is happening 24/7. If a person wants to pay for sex in a safe, regulated place then he or she shouldn't be condemned for it because non-commercial sex is already happening. In fact, intimacy has been shown to have many healthy effects for a person from increasing the immune system to lowering the risk of heart disease. *The Top 11 Benefits of Sex* (2013). (http://articles.mercola.com/sites/articles/archive/2013/11/18/11-sex-health-benefits.aspx) *Lawrence* has truly opened the doors for the legalization of prostitution. To put it more precisely, *Bowers v. Hardwick* (1986) said that if homosexual conduct was legalized, other "sexual crimes" would follow, with Justice White concluding, "We are unwilling to start down that road." *Lawrence* invalidated *Bowers* and Justice Scalia gave the same reasoning, as Justice White did, in his dissent. The toothpaste can't be put back into the tube now, so to speak. The can of worms have been opened up, and it would be unconstitutional to say that some sexual conduct has rights while other conduct does not. *Id.*

107.    The As Applied brothel laws of Utah (76-10-1302(b); 76-10-1303(b); 76-1304(iii); 76-10-1305(a)(e); As Applied 47-1) are implicitly discriminatory in that disabled people have a higher risk of being arrested for soliciting for sexual services than non-disabled people. It is honestly hard to gather statistics on patrons of prostitutes due to the illegal nature of the business. The arrest statistics that are available do not focus on disabilities or characteristic traits. They only focus on age range, ethnicity, marital status, and education. Charlotte Alter. *Cops Arrest 500 Johns in Sex Trade Crackdown*. Time. (August 5, 2014). But if one uses logic,

they can turn to already legalized areas of prostitution and see that disabled people do comprise a large aspect of consumers: the Bunny Ranch; countries in Europe with legalized prostitution; etc. With reasonable presumption, disabled people here in Utah and elsewhere are engaging in it illegally. Marguerite Ward. *The Surprising Way the Netherlands is Helping Its Disabled Have Sex.* Mic.com. (March 13, 2014). Disability Studies Quarterly has established that sex and sex access is a right and obtaining the expression of that right does not matter whether it be commercial or non-commercial. Holly Anne Wade. *Discrimination, Sexuality and People with Significant Disabilities: Issues of Access and The Right to Sexual Expression in the United States.* Disability Studies Quarterly. (2002).  Whether that right is a fundamental right or a right proven under rational basis review does not matter. Both reviews and tests have been previously established in this legal brief. The brothel laws in the state of Utah are implicitly discriminative and must be struck down to allow legalization to allow access to sex for the disabled.

### B.  Denial of Equal Protection for Those Who Choose to Work in Prostitution

108.    Sexually Oriented Businesses are regulated by the counties of Utah. *Utah Code 17-50-331.* These type of businesses include strip clubs, escort services, adult toy stores, and pornographic book stores. They do not include prostitution. In fact, when one goes to register for a Sexually Oriented Business, they are asked how they will stop prostitution from happening. In many cases, prostitution is still happening even after these businesses declare that they will not engage in prostitution.

109.    Plaintiffs see the sexually oriented business laws of allowing some sexually oriented businesses and outlawing other sexually oriented businesses as a hypocritical form of

law. In the City of South Salt Lake's Ordinance on Sexual Orientated Businesses, it even

acknowledges that one of the secondary effects stemming from such businesses is prostitution.

*An Ordinance Of The City Of South Salt Lake City Council Amending Chapter 5.56 Of The*

*South Salt Lake City Municipal Code, Concerning Licensing Requirements And Regulations For*

*Sexually Oriented Businesses.* (2012). An infamous study backs this up by saying that bikinis

cause men to see women as objects and that action impulses can trigger the brain when looking

at women. *Bikinis Make Men See Women As Objects, Scans Confirm.* National Geographic.

(2009). Therefore, hypothetically speaking, if a stripper or an escort knows that they can make

more money by working in prostitution by knowing that is what men want upon seeing their

nakedness, then it puts the stripper or escort at risk of arrest of engaging in paid sexual

intercourse.

110.     The reasonable thing to do would be to outlaw all sexually oriented businesses in

the State, as seen with the State's declaration that porn is a health crisis. *Utah Declares*

*Pornography a Public Health Crisis.* CBS News. (2016). Iceland did this years ago because they

found that stripping fueled the sex trade. *Legislation Bans Stripping In Iceland.* Iceland Review.

(2010). But the legislatures can't make stripping or escorting illegal due to the previous Supreme

Court rulings that make that conduct protected under the 1st amendment. *Erie v. Pap's A.M.*

(2000). Therefore, all sexually oriented businesses must be legalized to not deny workers and

customers the right of equal protection. They are participants in the adult entertainment business

and deserve that protection. The As-Applied challenged laws must be struck down to allow

women the right to work in brothels. They have that right as much as stripping or being an

escort.

**CLAIM THREE:**
**Section 1983 Claim for Violation of Fourteenth Amendment Substantive Due Process Right**
**to Earn a Living**

111.    Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

112.    The As Applied brothel laws of Utah (76-10-1302(b); 76-10-1303(b); 76-1304(iii); 76-10-1305(a)(e); As Applied 47-1) makes the act of running, erecting, owning, working in a brothel (a house of prostitution) a crime in the State of Utah.

113.    Many persons in the State of Utah, including Plaintiff Christie herein, desire to engage in the commercial exchange of sex, but refrain from doing so for fear of being arrested and prosecuted. Alternatively, many persons, including Christie, have in the past engaged in the commercial exchange of sex despite the threats of criminal prosecution because this profession provides them with a livelihood and the ability to support themselves and/or their families. They would like to do so in the future in a safe, legal place, but for Utah's prohibition of brothels, they can't.

114.    Because these statutes severely infringe on the ability to earn a living through one's chosen livelihood or profession, it unconstitutionally burdens the right to follow any of the ordinary callings of life; to live and work where one will; and for that purpose to enter into all contracts which may be necessary and essential to carrying out these pursuits, all liberty interests protected by the Fourteenth Amendment right to substantive due process. *See e.g., Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *Allgeyer v. Louisiana*, 165 U.S. 578, 589-90 (1897).

115.    Insofar as they are enforcing Utah's brothel laws, the District Attorney and the Attorney General, acting under color of state law, have deprived, are depriving, and will continue to deprive Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

116.    Plaintiffs are therefore entitled to a declaration that As Applied brothel laws of Utah (76-10-1302(b); 76-10-1303(b); 76-1304(iii); 76-10-1305(a)(e); As Applied 47-1) violate the substantive due process right to earn a living, and injunctive relief prohibiting the enforcement of the As Applied statutes as violative of the Fourteenth Amendment to the United States Constitution.

## CLAIM FOUR:
### Section 1983 Claim for Violation of First Amendment
### Freedom of Association

117.    Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

118.    The First Amendment to the United States Constitution affords constitutional protection to the freedom of association. Construing this constitutional protection, the Supreme Court has held that the Constitution protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships. *Board of Directors of Rotary Intern. v. Rotary Club of Duarte*, 481 U.S. 537, 544 (1987). Indeed, "the freedom to enter into and carry on certain intimate or private relationships is a fundamental element of liberty protected by the Bill of Rights." *Id.* at 545. "Such relationships may take various forms, including the most intimate." *Id.*

119.     The As Applied brothel laws of Utah (76-10-1302(b); 76-10-1303(b); 76-1304(iii); 76-10-1305(a)(e); As Applied 47-1) severely infringe on the rights to freedom of association of many persons in the State of Utah, including Plaintiffs herein. By prohibiting the commercial exchange of private sexual activity, many persons in the State of Utah, including Plaintiffs herein, are unable to enter into and maintain certain intimate and private relationships.

120.     Insofar as they are enforcing Utah's prostitution laws, the District Attorney and the Attorney General, acting under color of state law, are depriving and will continue to deprive Plaintiffs of rights secured by the First Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

121.     Plaintiffs are therefore entitled to a declaration that The As Applied brothel laws of Utah (76-10-1302(b); 76-10-1303(b); 76-1304(iii); 76-10-1305(a)(e); As Applied 47-1) violate freedom of association, and injunctive relief prohibiting the enforcement of said laws as violative of the First Amendment to the United States Constitution.

## CLAIM FIVE:
### Violations of the Utah Constitution

122.     Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

123.     The As Applied brothel laws of Utah (76-10-1302(b); 76-10-1303(b); 76-1304(iii); 76-10-1305(a)(e); As Applied 47-1) violates Article I, Section 7 of the Utah Constitution by depriving Plaintiffs and all others similarly situated the right to substantive and procedural due process. In the manner set forth in Claims One and Three

above, the statutes impinge upon the fundamental rights to sexual privacy, to live and work

where one will, to pursue any livelihood or vocation, and to associate.

124.     The As Applied brothel laws of Utah (76-10-1302(b); 76-10-1303(b); 76-

1304(iii); 76-10-1305(a)(e); As Applied 47-1) also violate the Utah Constitution's Free Market

Clause found in Article 12, Section 20. As set forth in Claims Two and Three, the statutes

prohibit the running of a legalized business that has a business plan which is in violation of the

Utah Constitution.

## IRREPARABLE INJURY

125.     Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully

set forth herein.

126.     Plaintiffs are now severely and irreparably injured by the As Applied brothel laws

of Utah (76-10-1302(b); 76-10-1303(b); 76-1304(iii); 76-10-1305(a)(e); As Applied 47-1, state

laws that violate the Due Process Clause of the Fourteenth Amendment. By way of example

only, Plaintiffs' injuries include the deprivation of rights guaranteed by the Fourteenth

Amendment and the severe humiliation, emotional distress, pain, suffering, psychological harm,

and stigma caused by the State of Utah's restrictions on Plaintiffs' ability to decide how to

conduct their private lives in matters pertaining to sex. Plaintiffs' injuries will be redressed only

if this Court declares the As Applied Challenged laws unconstitutional and enjoins the Governor,

District Attorney and the Attorney General from enforcing the laws and allowing plaintiffs to

apply for a business license to start the Mile High Neon brothel.

127.     An actual and judicially cognizable controversy exists between Plaintiffs and

Defendants regarding whether the As Applied Challenged brothel laws violate the
federal and state constitutions with questions raised as to whether the above laws violate
plaintiffs' equal protection and due process rights and their rights to associate with whom they
want by starting a business.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for judgment as follows:

1.      A declaration that Utah's brothel statutes, As Applied brothel laws of Utah (76-10-
        1302(b); 76-10-1303(b); 76-1304(iii); 76-10-1305(a)(e); As Applied 47-1), are
        unconstitutional;

2.      Preliminary and permanent injunctive relief prohibiting Defendants from enforcing
        mentioned statutes of the Utah Code, and allowing plaintiffs to obtain a business
        registration and to work with the Utah legislature to create laws for allowance of a legal
        brothel.

3.      An award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. §1988; and

4.      Any other such award or relief that the Court finds justified under the circumstances.

Dated: October 16, 2016

                                                RUSSELL G. GREER
                                                PRO SE LITIGANT

                                                By: /s/  Russell G. Greer
                                                Russell G. Greer

10/18/2016